JOHN SIMON, Respondent *v.* CHEMICAL BANK & TRUST COMPANY, Appellant. *

First Department, April 21, 1939.

*Justus Sheffield* of counsel [*Philip A. Carroll* with him on the brief; *Shearman & Sterling*, attorneys], for the appellant.

*Charles H. Tuttle* of counsel [*Hiram Thomas* and *Beekman H. Pool* with him on the brief; *Lawrence Berenson*, attorney], for the respondent.

CALLAHAN, J. Plaintiff's complaint sets forth three causes of action, each presenting the same claim in a different form. The basis of all causes is that plaintiff was employed by defendant in 1934 to work out plans which would enable defendant to receive in American dollars the proceeds of certain commercial credits then owned by the defendant in Germany. The complaint asserts that defendant agreed to pay plaintiff his expenses and ten per cent of any credits liquidated.

The first cause of action alleges that the defendant willfully and in violation of its agreement directed plaintiff to cease performance of his services, and that the plaintiff was thereby prevented from earning the compensation agreed upon, and was damaged in the sum of $500,000 plus $2,500 expenses.

The substance of the second cause of action is that plaintiff performed the contract to the extent of arranging a plan for the liquidation of $3,500,000 of German credits, and that defendant prevented further performance; that plaintiff thereby earned ten

* Revg. 166 Misc. 687.

per cent commission on the face amount of $3,500,000. This cause of action seeks recovery of $350,000 plus $2,500 expenses.

The third cause of action proceeds on the theory of a *quantum meruit* for services rendered. Plaintiff alleges that his services were of the reasonable value of $350,000.

The case was submitted to the jury in a charge which presented plaintiff's claim in a manner that combined parts of all three causes of action. The jury was advised concerning plaintiff's claim in the following language, most of which represents quotations from the complaint:

" In the first place plaintiff claims — that was the statement made to him, which is admitted by the defendant — that the bank possessed seven or eight million dollars of German credits. Then the plaintiff says that, ' on or about the 4th day of January, 1934, the plaintiff and the defendant entered into an agreement whereby the defendant employed the plaintiff and engaged his services to aid, assist and advise the defendant with respect to the collection or liquidation of the aforementioned indebtedness,'— that is the German credits — ' or otherwise to work out plans for the defendant whereby it would be enabled to receive American dollars in liquidation or exchange of the whole or part of said indebtedness and obligations of said German banks and other concerns due and owing to the defendant.

" ' That by the terms of said agreement, the plaintiff agreed to use his best skill, experience, knowledge and judgment and devote his best efforts and all his time to the aforesaid employment. That further as part of the said agreement, the plaintiff and defendant agreed that the plaintiff should employ such means and to obtain the assistance and co-operation of such other persons as the plaintiff deemed necessary for such purposes and in such employment, and that the defendant should render all necessary aid and assistance to the plaintiff, employ its funds, advance such sums of money and use its credit and resources, and enter into such transactions and do such necessary and needful things as would enable the plaintiff to collect, liquidate, realize on, obtain or otherwise work out part or all of the indebtedness and obligations aforesaid due to the defendant.

" ' That further by the terms of such agreement, the defendant agreed to reimburse the plaintiff all sums paid, laid out or expended by him or by those whom he obtained to assist him in performing the aforementioned services, and as compensation for the services rendered by the plaintiff and by those whom the plaintiff obtained to assist and cooperate with him, the defendant agreed to pay the plaintiff 10% of any of the aforesaid credits collected, liquidated, realized on, worked out, obtained or returned to the defendant.' "

The court then advised the jury that plaintiff claimed that defendant had breached its agreement, and that if the jury found that the defendant had prevented the consummation of plaintiff's services, it was for the jury to say what damages were suffered, and that they might award the sum of $350,000 or a lesser sum, depending upon the value of the services.

The jury rendered a verdict in favor of the plaintiff in the sum of $119,166, which was one-third of the $350,000 plus $2,500 expenses.

We think that the court erred in submitting this case to the jury and that the complaint should have been dismissed for failure of proof. There was no evidence adduced on the trial to support the allegations in the complaint that the defendant employed plaintiff to " aid, assist and advise the defendant with respect to the collection or liquidation of " the German credits, or that the parties agreed that plaintiff was to " use his best skill " or " devote his best efforts and all of his time " to the aforesaid employment. Nor was there any evidence to establish that defendant agreed to " employ its funds, advance such sums of money and use its credit and resources, and enter into such transactions and do such necessary and needful things as would enable the plaintiff " to liquidate or otherwise work out part or all of the said credits. In fact plaintiff's testimony as to the terms of the contract of employment established that he was hired by the defendant upon the understanding that he was to be paid ten per cent for all German credits actually liquidated with plaintiff's help or through his ideas.

Plaintiff testified that the contract of hiring was entered into during a conversation had between himself and Mr. Bower, an officer of defendant. He gave that conversation as follows:

" He said that the Chemical Bank had about eight or nine million dollars credits over in Germany which they were very eager to get out of Germany. * * * Then he said, ' If you can help us, of course we will compensate you very liberally. * * * ' I said, ' * * * Now, if I should concern myself with what you want me to do, I want to come to an understanding right here with you. I am not going to tackle any such proposition without being liberally compensated for it. I may have to take in other people to help me do it. I may have expenses.'

" So Mr. Bower said, ' Well, what is your idea about it? ' I said, ' Ten per cent of any money which through my help you should be able to get out of Germany, and all expenses paid in connection with my work. If you agree to that, I will disclose you some of my ideas which I have, and if after disclosing you some of my ideas, you should find that you already know one or all of them,

then, of course, you tell me right away and we will forget the whole thing.'

"So Mr. Bower said to me, 'We would be only too glad to pay you ten per cent commission on the money we can liquidate or can get out of Germany, and of course we would pay your expenses,' * * *. So I said, 'All right. * * *'"

Upon cross-examination plaintiff explained his arrangement with Bower more fully, as follows:

"He stated further that the Chemical Bank had tied up in Germany about eight or nine million dollars which at the present time — or, rather, at that time — were in form of German credits, dollar credits, owing to the Chemical Bank by various banks and industries. He told me then that the credits with the banks, with the German banks, were under a so-called standstill agreement, which means an agreement between American banks and the German Government.

"He stated * * * that if I would know of any idea to help them to get the money out, * * *.

"I told Mr. Bower that I had never interested myself in solving a similar problem, * * * that I would not doubt that if I would study the question that I could help * * * the Chemical Bank * * *; but I said, 'Mr. Bower, before I shall disclose you any of my ideas — and you know what it is with ideas, the minute you tell them they are ordinary things — I want to come with you to a definite understanding, and I want you to tell me if at any time you heard of what I disclose to you now.' With other words, that he would have heard of or known the idea which I was to disclose. 'I want to come to an understanding that for all moneys or all credits, German credits, liquidated on my help or idea, the Chemical Bank is compensating me with ten per cent. Furthermore, I want it to be understood and agreed that the Chemical Bank is paying all expenses which I may have in connection with the performance or executing of my ideas.'

"Mr. Bower replied: 'I agree.'"

There is no testimony in the record concerning a contract between the parties other than that disclosed in the testimony quoted above. It is evident, therefore, that the plaintiff was hired upon the understanding that he was to be paid ten per cent of any moneys obtained by liquidation of German credits by the defendant upon ideas advanced by plaintiff. His compensation depended on use of his ideas and success in liquidating the credits. Plaintiff conceded that no German credits were ever liquidated by the defendant on the basis of any idea advanced by him.

The evidence discloses that after the hiring plaintiff suggested to defendant a number of ideas concerning the subject-matter of

the employment. None of the ideas met with the approval of the defendant other than one which was approved generally. Briefly stated this idea was that the credits be liquidated by the purchase of cotton for export through an arrangement with one of the United States governmental agencies. The testimony discloses that defendant's officers agreed to such a plan if it could be worked out satisfactorily to them. Plaintiff's first suggestion was that the cotton be bought from the Farm Board (a United States governmental agency) and paid for with the credits held in Germany. After consultation with a man named Owens, who was formerly engaged in the business of exporting cotton, plaintiff advised defendant he had brought in Owens to aid him and that at Owens' suggestion he had changed the plan to one of exporting the cotton through the agency of the Reconstruction Finance Corporation. Plaintiff suggested that the defendant should form a corporation with a capital of $700,000, in the name of which corporation a proposition was to be submitted to the Reconstruction Finance Corporation for the purchase by the newly-formed corporation of 100,000 bales of cotton. This would have required an investment of about $7,000,000. The defendant was to assign or sell to the corporation to be formed, or directly to the Reconstruction Finance Corporation, $3,500,000 of its German credits. The Reconstruction Finance Corporation was to pay to the new corporation $3,500,000 in cash against the credits so transferred. This money was to be used by the corporation to buy cotton for export. The defendant was required to furnish the remaining $3,500,000 necessary to make up the purchase price of the cotton. Although the details of this plan were changed from time to time, in substance the plan remained one whereby the defendant was required to finance the purchase and sale of cotton, partly through money borrowed from the Reconstruction Finance Corporation, using a part of its German credits as collateral for the loan. The variations in the plan mainly concerned proposed changes in the capital structure of the corporation to be formed, but in all of the variations it appeared that the Reconstruction Finance Corporation insisted on having a margin of twenty per cent as security against the non-liquidation of any of the German credits.

In other words, either by means of a capital of $700,000 contributed by defendant to the new corporation, which capital was to be left in the treasury to secure the Reconstruction Finance Corporation for any German credits not liquidated, or with a smaller capital and by means of the Reconstruction Finance Corporation advancing only $2,800,000 against $3,500,000 of assigned credits, a margin of twenty per cent was to be maintained to protect the

Reconstruction Finance Corporation against any loss in the event it was found that any of the German credits assigned could not be liquidated or were not paid.

The plan also entailed the necessity of the defendant, through its proposed subsidiary corporation, entering into the business of purchasing cotton and selling it abroad, with the attendant risk of a financial loss in connection with the transactions.

Considerable testimony was received showing the efforts which the plaintiff made to work out the cotton export plan on a basis which would be satisfactory to the defendant. Plaintiff also produced proof that the Reconstruction Finance Corporation was willing to make such a loan. Defendant was not primarily interested in borrowing money. It had ample funds to finance any transaction of the kind suggested. Plainly its only object in considering the borrowing of money from the Reconstruction Finance Corporation was that it gave a means of disposing of German credits. But in fact the credits would not be liquidated by the plan suggested by plaintiff, until actual collection by the Reconstruction Finance Corporation, though the loss on their liquidation might possibly be limited to twenty per cent in the case of the credits assigned as collateral.

Plaintiff's services entailed considerable labor on his part and not a little expense, all of which was incurred between the end of December, 1933, and the middle of March, 1934.

The defendant considered plaintiff's proposals and made suggestions concerning possible changes therein, but there is no evidence that it ever agreed to accept or proceed with the plan in any specific form. About the middle of March it eventually advised the plaintiff to drop the matter, as it would not undertake any plan of liquidating its credits that would entail the risk of losing a sum that might amount to twenty per cent of the credits assigned, plus the expenditure of the commission of ten per cent which plaintiff was to receive, and which would also entail some risk of loss in connection with the purchase and sale of cotton.

While there was some evidence that before the plan was disapproved defendant made a suggestion that if any such plan was accepted it would not pay a commission of ten per cent and that it had suggested a lower commission, it is plain that this was merely part of the negotiations concerning the possible acceptance of the plan and that no plan was actually accepted.

Considering the terms of plaintiff's hiring, it is plain that the defendant was entirely within its rights in considering and eventually rejecting suggestions which the plaintiff offered. The plan in all of its variations entailed the advancement of new capital

and the incurring of risks which might result in losses in the liquidation of credits at an expense to defendant far greater than the ten per cent that it had agreed to pay plaintiff. No phase of the plan which the defendant rejected could with reasonable certainty have effected the result which performance of the contract of hiring required, *i. e.*, the liquidation of the credits upon the payment of only ten per cent commission.

As plaintiff failed to prove either performance of his contract or that the defendant had wrongfully prevented performance thereof, plaintiff was not entitled to compensation either on the theory of breach of contract or upon a *quantum meruit*. Trial Term should have dismissed the complaint for such failure of proof.

In view of this determination, we find it unnecessary to pass upon the other questions discussed in the briefs.

The judgment should be reversed, with costs, and the complaint dismissed on the merits, with costs.

MARTIN, P. J., DORE and COHN, JJ., concur.

Judgment unanimously reversed, with costs, and the complaint dismissed, with costs.